May it please the Court, Stuart Gillespie on behalf of the Conservation Groups. I'll be addressing two issues this morning, the faulty groundwater accounting and the flawed no jeopardy determination for the Northern Mexican Carter Snake. I'd like to reserve five minutes for rebuttal. Turning to the first issue, the San Pedro River is one of the last free-flowing rivers in the desert southwest and a lifeline for millions of migratory birds and pumping, however, is reducing flows along that river, imperiling species protected by the Endangered Species Act. And yet the Fort continues its groundwater pumping based on an accounting trick. That trick was to transform the Fort's groundwater deficit into a surplus by claiming a massive water credit for preventing irrigation that was not going to occur anyhow. That illusory credit does not offset the Fort's groundwater pumping. It does not comply with the law, and we urge this Court to remand to the Fish and Wildlife Service to identify effective... What's your response to their argument that that's in the accounting, but if you look at the modeling, which doesn't take the easement into account, the modeling shows that there's a net effect is positive, or the one negative effect was within the noise range. What's your response to that? Two responses, Your Honor. First and foremost, the agencies themselves, the biological opinion, identifies limitations in that model. And so it was not the sole basis for the biological opinion. And in fact, the service was very clear that it also relied on the accounting method and that that was the bottom line for ensuring that the Fort's groundwater deficit would not continue to cause declines in the river and imperil species. On the other hand, the agency seems to say the groundwater modeling is superior to the accounting. So where in the record are there specific references that you think the agency is relying on the demand accounting, which takes into account the easement? Certainly, Your Honor. And just to be clear, the biological opinion identifies both the accounting and the groundwater modeling as the best estimate of the Fort's pump impacts. And that's at 2ER0333. And Your Honor, there are specific places in the record, and this gets to the second point. The modeling did identify adverse impacts to the Huachuca water umbel, and that is at 2ER0197, where the service identified residual reductions in base flow that would adversely affect that property. The service explicitly relied on, quote, the conservation measure-driven water savings that, quote, overtake the influence of Fort Huachuca's water demands on base flows. That's at 2ER201. It also again replied on that surplus in concluding that there wouldn't be any adverse impacts to critical habitat, and that's at 2ER202. The service also relied on this surplus to ensure that there wouldn't be any adverse impacts to the garter snake, and that's at 2ER313. And so the biological opinion explicitly and repeatedly relies on this alleged surplus created by this illusory water credit as the backstop, as the linchpin of the analysis. And that's what it relied on to ensure there wouldn't be jeopardy. And to the question about whether this is noise in the background, the Fort and service have made that argument in the past. They've tried to argue that these are minor impacts. They're not going to jeopardize the species. And the courts have been very clear, this is in the Center for Biological Diversity versus Salazar case, that when we're talking about imperiled species, the service can't just downplay those impacts. It has to address them. And that's at 804F2D at 1002 to 1003. And the service, that's why it relied on this alleged surplus. That was a crucial piece of its analysis to get past the jeopardy determination. And so let me turn to that surplus. So to comply with the Endangered Species Act, the service had to demonstrate that the Fort's claimed water credit was reasonably certain to occur. That requirement gives effect to the statutory requirement to ensure against jeopardy. It's in line with the regulations which require the agencies to evaluate the reasonably certain effects of their actions. And it's consistent with this court's case law, which requires mitigation measures to be reasonably certain, and that that's required to ensure against jeopardy. That's why we need to be sure that this conservation easement is actually generating the alleged water savings that they rely on. So the Fish and Wildlife Service had to satisfy two requirements before it claimed that credit. First, it had to ensure the Fort had obtained a conservation easement, and that was in place. And then second, and most important, the service had to demonstrate the easement prohibited irrigation that was going to otherwise occur. Absent that, the easement does not generate any water credit. It's simply a paper exercise without any real world benefits, and without any real world benefits that are needed for these species that are facing declining flows along the river. And the service has been adamant about this requirement. It said the conservation easements, quote, do not result in an increase in flows and in joining streams unless an active water use is retired. That's at 2 ER 0332. And that was essential for this analysis here, where the claim water credit was the linchpin of the analysis. It's what they relied on to overtake the negative influence of Fort Huachuca's water demands. And for that to be true, for there to be an instantaneous credit here, there had to be evidence that someone was going to imminently irrigate this property with 2,588 acre feet of water. That's enough water to submerge this plot of land under 5.4 feet of water. Yet, the service never demonstrated that irrigation was reasonably certain to occur, let alone even likely. Rather, it cut corners and ignored and misstated critical evidence. Have we ever said in a case that the reasonably certain standard is different from the likely standard? The regulations themselves make clear that the reasonably certain standard is a cut above the likely standard. It requires substantial evidence that something is significantly likely to happen. Isn't the statutory standard likely? That's correct, Your Honor. The statute requires agencies to ensure against jeopardy by evaluating the likely adverse effects of the species. But to do that, the agencies have to evaluate all reasonably certain effects, everything that's reasonably certain to occur. And so, in the service's own handbook, what they've said is they need substantial evidence. So, they can, by regulation, raise the statutory standard from likely to more demanding? Well, the statutory standards, they have to ensure that it's not likely to jeopardize the species. So, it's likely to jeopardize. That's the likely comes in. And they have to ensure against that. And to ensure against that, they have to evaluate all the reasonably certain effects of the action. So, it's not that the regulations are increasing the standard. It's that the regulations are requiring what the agencies need to evaluate. And maybe it helps to put this in the context of the biological opinion. So, what the agencies did here is they said, look, Fort Huachuca is reasonably likely, reasonably certain to continue groundwater pumping at these elevated levels at about 6,000 acre feet per year during the entire action area, during this entire time period. But we're going to say that it's actually creating a surplus because it's offset by this water credit. Well, that water credit also then has to be reasonably certain to occur. You need that equivalence in the effects of the action and the benefits of the mitigation measures to ensure that species don't suffer jeopardy. And the case law is really clear that the goal of the Endangered Species Act is to protect those species and that the doubt goes to the species and that they shouldn't suffer from inadequate mitigation measures. Digging into the facts, there are three errors here that render the decision arbitrary and capricious. The first was that the service provided no evidence that irrigation was reasonably certain to occur. It didn't identify any plans. It didn't identify any contract to install an irrigation system. It didn't identify any trends in the area showing that irrigation was certain to occur, let alone imminently. And instead, it simply speculated that nothing precluded irrigation. And therefore, it claimed that maximum instantaneous credit for preventing 2,588 acre feet of water use. Did they ever get at least some credit for that? I understand your point that there was nothing imminent, and I know they immediately took credit for it. But does the easement at least have some value that they could put some value on it, at least in the future? What the agencies need to do is they need to go back and they need to demonstrate with substantial evidence what was reasonably certain to occur. And the record here, the four corners of the record, it shows that there's no evidence of irrigation, but that in fact that there was this trend towards residential development. And that's the second piece, the error that the service ignored. They ignored this evidence defying irrigation and showing that residential development was more likely to occur. And that irrigation, so the irrigation had ceased about a decade ago, and the prior owner, he had no intention to irrigate. He removed the center pivots, he platted the property, and he had a plan for residential development. And that was consistent with the major trend in this area. And residential development, to your question, would have used far less water. It would have used about 56 acre feet per year. That's far cry less than the 2,588 acre feet that they claimed for agricultural irrigation. And it's that delta, it's that massive inflation of this water credit without any evidence in the record. That's what renders the credit illusory and arbitrary and capricious. And we're not arguing that they can't claim any credits for this, but that they need to justify it consistent with the standards under the ESA, which is that substantial evidence. What was reasonably certain to occur? What did you stop from occurring? And then you can calculate the credit. You can't do it just based on assumptions about irrigation occurring. Can I ask you a question about the procedural posture of this case? Because the district court already found certain faults with the biological opinion and told agency to, you know, redo it. So are you asking this case, I don't know what the status is of that biological opinion, to include that as part of its reassessment of the biological opinion? Right. What we're asking, what's the timeline for that? I don't know if the district court put a timeline on, or maybe if the agency, maybe better directed to a government lawyer, but you know, what's the posture, current posture? Yeah, I'm not aware of where the agencies are in their process. What I do want to make clear is that they continue to rely on this biological opinion. They continue to rely on this alleged water credit. And we were asking this court to send this back, remand to the agencies to evaluate that initial step of whether they can claim any irrigation for this property and whether they have any proof that that was occurring. I do want to turn to a third critical error in the services analysis. And it misstated facts showing that the irrigation was almost certain to not occur. So, in its answering brief, it cited the Renzi case for the proposition that it wanted to obtain a conservation easement on this property. And presumably because it wants that, it should get that. That seems to be the logic. But that case shows that irrigation was not going to occur anyhow. The uncontroverted testimony showed that the prior owner had every intention to develop 160 homes. And he, while he offered to sell a conservation easement to prevent irrigation, that was purely to make money. And his testimony, the testimony captured this, that, quote, he was trying to get paid for the fact that he was going to convert his land from agriculture to development. And that easement to prevent irrigation, it did not pass the conservation tests. It was just a form of double dipping because he wasn't going to irrigate anyhow. And so, the services simply failed to learn the lesson from that case. And it is here trying to gain credit for preventing irrigation that was not going to occur anyhow. The service also misstates the facts on the ground, claiming that, quote, the entire irrigation infrastructure remains in place. That's a 2ER0069. That was the rationale it set forth for why it could claim irrigation credits. And that was simply not true. That irrigation infrastructure, the center pivots had been removed, some of the pumps had been excavated, and there's no evidence that anyone was planning to fix it or that anyone was planning to start imminently irrigating this property. And now the government tries to downplay that by saying that the property could be irrigated without center pivots. But again, that doesn't address the fundamental problem here. There's still no one, they haven't identified anyone with any plans that was going to irrigate with center pivots or flood irrigation or any other way. It's simply pure speculation that is defied by the government. In fact, the government itself, in the opinion, it acknowledged that it was uncertain when irrigation would commence, if ever. That's a 2ER193. And yet, it turned around and it claimed immediate water savings for preventing irrigation. That contradiction is a textbook example of arbitrary and capricious decision-making. I see that I'm starting to run low on time. So I do want to quickly turn to the second issue that I was going to address regarding the flawed no-jeopardy opinion for the northern Mexican garter snake. The presence of water is critical to the garter snake, and it's in peril due to threats such as groundwater pumping. And it's hanging on in dispersed populations that are on the brink of extirpation. And yet, the service ignored and contradicted its own scientific findings in asserting that the And there were two key areas here that we've outlined in our briefing. First, the service asserted that the fort's groundwater pumping would not jeopardize the species because the population was, quote, very low density and in poor condition. But its own listing decision proved the opposite. It showed that those low-density populations were highly susceptible and that the loss of a few individuals could drive local populations to extirpation. That's 78 Federal Register at 41536. And that loss, in turn, could enhance the risk to the species, not minimize it as the service incorrectly concluded. Second, the service claimed that the garter snake would avoid dewatering by simply moving 10 kilometers. This kind of run for your life theory contradicts the science. In the listing decision, it shows that these register 41554. This is their home, and they cannot escape the impacts of the fort's pumping. The service failed to analyze these impacts, and the court should remand to address this matter. I ask you a question about the second issue because you relied on case law that says, you know, you have to take into account the baseline conditions, and you might even have a loss of one animal might be enough for a jeopardy finding in light of the bad baseline conditions. Does that same standard apply given the special modification that Congress has made to Section 7 here where it says that for purposes of this project, you only look at what things are related to the project and not otherwise? Because that seems inconsistent with this baseline case law. The National Defense Authorization Act still requires the service to account for the adverse impacts of the fort's pumping. Correct. So that is considered in the context of the baseline. It can't escape the baseline condition. Right, but part of the baseline is not there doing. Part of the baseline is, that's correct, that there has been pumping by other operators in the basin. Fort Huachuca is the largest single pumper though, and it has already caused declines that have reduced flows and impacted these species. And the service cannot rely on the Defense Authorization Act to minimize the baseline. The baseline is what it is, and they have to grapple with the fact that the fort is exacerbating those harms. Unless there's any further questions, I'll reserve the remainder of my time. All right, counsel. Good morning, your honors. John Biese on behalf of the federal defendants. The ultimate question in this case is whether the services no jeopardy conclusion here is arbitrary and capricious. If you look at the 2014 biological opinion, which covers the period from March 2014 to March 2024, you'll find a reasoned explanation for that conclusion grounded in that this analysis included multiple strands of evidence that included a groundwater model and the groundwater demand accounting. Both of these sources of information are imperfect. The court considers them, I'm sorry, the agency considers them both together as complementary lines of evidence. So, it's incorrect, I think, to say that the demand accounting is a linchpin. If it's complementary lines of evidence, then that would suggest that a defect in one brings down the whole thing. So, we couldn't say that the modeling showing a benefit is enough to save this if we were to find that there were defects in the accounting side. We're saying that, yeah, I agree, your honor. If it's completely, if you think the demand accounting is completely flawed and it provides no valuable information on the state of the groundwater, that would be a problem that would need to be corrected. But I think pulling it out in isolation and saying that's the only thing that matters is not taking account for how the agency actually thinks about these issues, which is we have the groundwater model. It shows the best evidence of kind of the spatial and temporal effects of the groundwater pumping and other flood activities on base flow in the rivers. We also have the demand accounting, which provides important inputs to that model and gives us kind of a rough estimate of the impact. But parts of the demand accounting are obviously fictional. I mean, the notion that as soon as the credit is just divorced from reality, isn't it? And on this record? I think it is true that it immediately precluded potential agricultural irrigation on the parcel, but the agency did consider. But it has to be some kind of but-for causation and, you know, that you don't get a credit for something that isn't going to occur anyway. It's that you took an action, the government took an action, and it didn't occur. And even if it was likely that it was going to occur at some point, the notion that that full volume was going to happen in 2014 seems very hard to sustain on this record. Right. But if you look at the analysis, for instance, of the water umbrella and the kind of impacts there, the agency says, even though the surplus is mathematically anticipated immediately, we still consider the possibility that there will be a delay and look at the impact of that delay on the water umbrella. So they considered that possibility as part of their analysis in thinking about the jeopardy question. So you're saying that they sort of acknowledge that here we have this chart and we put the numbers in, but the numbers may not actually work out and we're taking out into account that they're probably not going to work out as the chart just shows. The chart has a lot of estimates that has a conservative estimate of how much water the fork will use as other estimates. They have to, you know, take all of those together and look at what they think is reasonably starting to occur based on both those estimates and based on the groundwater model and think about whether they think... Now, where in the opinion is the reference you were just making to the water umbrella effect? I'm looking for this. Give me one second. I'll have to get back to you on that. I have it in my notes, but it would take a little time. There's a couple of laws in the water savings calculation that I wanted to give you a chance to address today. One is the assumption that the land would be utilized for agricultural uses because there was a very specific determination that the surplus would be realized soon after 2014. The land had not been used for agricultural purposes since, I think, 10 years or so earlier. So I want you to address that. The other is there seems to be a discrepancy in terms of whether the easement covers three fields versus four fields. And it's unclear to me whether the water savings calculation will be affected if it's three fields versus four. Can you address those two deficiencies? Sure. Turning to the first one, the agency has to make an estimate of what they think is likely to happen in the future. The property has been put to agricultural use throughout its history with two brief exceptions, one in World War II when a portion of the property was used as an airfield by the Army, and one from 2006 to 2013 when it was tied up in land speculation in the Renzi case. Other than those two instances, it has been used for agricultural use throughout its history. Was the fact that the lapse in use was due to the Renzi case, that wasn't referenced in the opinion, was it? Right. The long history of use was referenced in the biological opinion. The plaintiffs made a point about the immediate period prior to the easement. I know that there was a response indicating that the property had been embroiled in a land speculation scheme and references that Renzi case. We can't look at that, right? All we can at is what's proffered in the opinion itself. Well, you can look at anything that's in the administrative record, I think, to determine whether or not there was a basis for the decision in the record. As courts have recognized, in litigation, we can provide a more detailed explanation for things based on the record that's not a post-op rationalization. It's not a new basis, but it's an explanation based on what's in the record. And I think, just to be clear, the Renzi case makes clear that the value of the property or the land exchange scheme that Renzi was interested in was not residential use. It was to exchange the property in a congressional land exchange for other property premised on the force interest in the property. So although one of the people implicated in the scheme testified that they wanted to use it for residential use, I think that if this court credited that testimony, the conviction would have been overturned because the conviction was based on the view that there was, this is a quote, that conspiracy to export private businesses to purchase land owned by Sandlin, that's the property at issue here, in exchange for Renzi's promise to support favorable federal land exchange legislation where they would exchange this land. Right, but to the extent that that whole analysis, the scheme and the land scheme matters, you would expect that the service would cite to that? The service did cite to the long history of agricultural use on the property and, you know, the past is prologue. The best way to extrapolate what's going to happen on a property in the future is to look at what's happened on it on the past. Isn't the standard water savings have to be reasonably certain to occur? And I think what you're saying is, well, it's possible, maybe it'll occur, but... I think the agency needs to make a judgment about what it thinks is reasonably certain to occur based on the evidence before it, and then it's reviewed as to whether that's rationally related to facts in the record when the court assesses whether or not there was a basis for that agency determination. But here, the plaintiff suggested that the agency needed to wait until there were plans in place to grow crops on the land or contracts for sprinklers. If they wait that long, that is too late. At that point, there's a business that's already made an investment that's working the property. You have to do it at a time when you can actually purchase the property and get the easement. The second thing that I think really reinforces that this property was going to be used for agricultural use is the concrete value of the water on the property. By the terms of the easement, the water rights in the property were worth 96% of the property right, of the parcel price. And this makes sense because there are very few parcels left in the area where there are three permitted wells that can be used for irrigation of the land. So, it's quite valuable to have those wells. If I can interrupt, just one question, a technical question. The CFR that refers to mitigation measures, 50 CFR 402.02, seems like the parties and the briefs refer to the 2014 version, but it looks like the district court may have cited the 2019 version. Do you have any view which one would apply here and whether that makes a difference? The 2014 version applies to the biological opinion here because it was in effect when the administrative decision was made. But I think the present, the current version is just attempt to clarify or elaborate on that. So, I don't think there's a big difference. I do think if you look at, for instance, the new section 402.17, it does give you some guidance for the type of things that might guide a consideration like this, which includes past experience, current plans, and then whether there's any legal impediments or requirements for an activity. And here, the easement is the only way to preclude agricultural irrigation on the property. Here in Phoenix, we're in an active management area where under Arizona state law, you couldn't just go out and start pumping groundwater to irrigate land. There'd be restrictions. You'd have to jump through a bunch of hurdles. That's not true in the Sandpaker Basin. In the Sandpaker Basin, if you have a well, if you have property, you can make any beneficial use of groundwater on the property that you can. There's no legal restrictions. If a foreign conglomerate wanted to come in and grow alfalfa and export it, there'd be no legal impediment to them doing that. I want to turn to your other question about the estimate of the amount. There, the agency's estimate is simply based on taking the available agricultural acreage in the property, which is 480 acres. It's three quarter sections. A quarter section, a section is 640 acres and multiplying that by the average water duty for agriculture in the basin. When it was irrigated with center pivot irrigation, because those make a circular field, it was only about 120 acres of each quarter that was irrigated. So only 360 acres were irrigated in the past. But the agency did not assume that center pivot irrigation would resume. The primary mode of irrigation in this county is flood irrigation. Flood irrigation would work on alfalfa or other crops grown in the area, and it wouldn't require putting the center pivots back in place. So it was reasonable. So they covered, they just took the entire acreage that was available and multiplied it by the average water duty for the mixture of crops and irrigation methods used in that county. So they used 480 acres, which is the amount of the full acreage of the three quarters and not the circles that were irrigated by the center pivots. But there's a reasonable basis in the record for using that amount. On this, I'd also note that even if you switch to 360, it would still, even if you did a calculation based on 360 and use the consumptive use rate for all of the agricultural easements, which is the issue on remand right now, switching to the consumptive use rate rather than the water duty, because when you irrigate, some of the water goes back into the land. If you use that in 2022, there would still be essentially a net balance in the demand accounting. It wouldn't show a deficit. You may have addressed that, I may have missed it, but in terms of the water credit, the agency assumed that the benefits were accrued immediately. I mean, wasn't that a flaw? Because I mean, it's pretty clear it's not going to happen immediately. So they had multiple lines of evidence when they were thinking about jeopardy, and one of them was the demand accounting, which did assume mathematically that there would be the savings immediately. But they also looked in their analysis, they also had two things. One in there, they also had the groundwater modeling, which showed largely net positive effects even without the easements on base flow in the rivers. But then they also did look specifically in the water umbrella analysis, for instance, that even though this is mathematically anticipated immediately, we still looked at whether, if there is some delay, will that delay have an impact that we think implicates jeopardy? So they took all of this evidence and reached a conclusion that they didn't think there was likely jeopardy. It is, and that leads to my next question, I guess, and then the biological opinion, it's on 2ER198 footnote 5, and I'm trying to understand what it means. That footnote 5, it says Fort Huachuca's positive influence on base flow could begin in 2014 due to the fact that the acquisition of the Petrified Forest Conservation Measure C10 was completed in 2013. So that seems to suggest that they're assuming that the benefits will begin then. Are we reading this correctly? The demand accounting, that piece of the evidence did assume it would happen immediately, but they also had the groundwater model, which didn't take that into account and still showed net positive benefits on the San Pedro River. And they also did think about whether or not, if there was a delay in the implementation of these various pieces of the mitigation measures, did they think that would create jeopardy? Because if, you know, if the demand accounting is in a deficit for a year, that does not necessarily mean there will be jeopardy immediately. That water isn't even necessarily going to go directly to base flow in the rivers. A lot of it would disappear in transit operations. I think it's just a more general problem with the biological opinion, because it's just unclear to me what the agency is relying on and for what purpose. It's just, it's kind of all jumbled up. You know, was it demand counting or groundwater modeling? And it seems like maybe we need to send it back for the agency to clarify. So there's a section in the opinion that's at 2 ER 116 and 117, that talks about the relationship between those two models. The demand accounting is a snapshot in time and it doesn't account for the spatial and temporal patterns in but it does give you a rough estimate of the net impact on sustainable yield for the aquifer. So they're using it because it gives you that impact on the aquifer and also gives you inputs that are important for the demand accounting. But then the opinion also says for assessing the impact on base flow, the temporal and spatial impacts on base flow in the rivers, the model is the best evidence. And it says that on 117 there. And so, if you're looking at what is the impact on the base flow during the action period at issue here, they say the model is the best impact. But I think you said at the outset in answer to my question that if we were to conclude that the accounting piece of it was defective, that this needed to go back. I thought you conceded that you weren't saying you could pull that piece out and it still survives. I mean, I think it depends a little on what you're reading. If you think they miscalculated and that should have been a little lower, I think there we would say there are arguments that that is harmless error if it's still showing like a relative balance. Well, let me follow up with that, counsel, because we were discussing about whether there is a miscalculation with regard to the fields. So, if we think that there is a problem with the accounting and that the service miscalculated the fields involved with easement, I thought that you said that there would still be a surplus in the accounting. Right. If you'd calculate it based on Plaintiff's proposed 360 acres instead of 480, which we believe is incorrect because there are 480. Right. But even if there's a surplus, there's still a reduction in the water savings, right? So, how do we know that that wouldn't make a difference in the no jeopardy analysis? Because mathematically, the demand accounting would not show a deficit, it would still show a relative balance in 2022. And especially if you went back and recalculated now, the agency would use what we know is in fact the water usage from 2014 to 2021, which was much lower than the 6,000 acre feet a year estimated. It was in roughly the 4,500 to 5,000 acre feet a year. So, there'd also be roughly 1,000 to 1,500 additional acre feet of water there that would go into the demand accounting if you recalculated now. And I think in that context, knowing that both it is in rough balance and there is additional water savings in the demand accounting that would show up based on the facts as opposed to the concern from conservative estimates. If we find that there was a miscalculation with regard to the amount of irrigated land and there's a problem with the accounting, is the analysis different with regard to the water umbel and the garter snake and the yellow-billed cuckoo? Or should we just send the whole thing back if we were to send it back? I think that if it's based on, if you think the demand accounting is incorrect and it's not harmless error, I think it would have to go back for the agency to consider whether recalculating the other core things. Because they all share the same ecological environment. I mean, the way the water affects the species is different because, for instance, the yellow-billed cuckoo depends upon trees. And small shifts in the water might just mean that you have mesquite trees instead of cotton trees. And they're both fine for the birds. So, it might not impact the cuckoo, but it might impact the umbrella or the garter snake differently. So, I think they'd need to look at those issues if you thought there was a significant problem in the calculation that wasn't harmless. So, send it back so the service can take a new look at, with regard to all three species. Right. If you think that the error is big enough that it's not harmless error. Going back to the question you asked about the biological opinion, considering the whether or not there may be a delayed effect that's on 2ER-195 for the water umbrella. If you don't have other questions on the groundwater piece, I'll turn briefly to the garter snake. Where plans challenge the impact of ford operations specifically on one population of the garter snake in the lower Bava Kamari River. Again, the question here for the agencies is whether the four sections will likely jeopardize the survival and recovery of the garter snake as a species, which means the status of the species range wide, plus the role of this population and the survival or recovery of the species. Cuban agencies provide a reasonable explanation for rounded and record evidence for why it would not jeopardize it. First, I need to emphasize, we're talking about a very small effect on a very small population. The estimate here is five to nine. The estimate here, based on the modeling, is five hundredths to nine hundredths of a cubic foot per second reduction in flow in the summer, 10 years out, which is the highest, at the time of most interest. That is a very small effect. And as I noted, the briefing notes, an effect of a tenth is often to be modeling noise. But the agency even assumed that these small, difficult to measure reductions in base flow would have minimal seasonal and reasonably localized effects on the river. That's a three-year-old response to the question I asked your opposing counsel about whether the special NDAA provision modifies the legal standards in the context of this issue over the garter snake and the baseline. I think the existing baseline would still need to be taken into account. And we think the agency did take the existing baseline into account. What the Section 321 would prevent. The case, for instance, that plaintiffs rely on is National Wildlife Foundation versus the National Marine Fisheries Service at 524 F3rd 917. In that case, the court explains their approach simply requires the service to appropriately consider the effects of its action within the context of other existing human activities that impact elicited species. To the extent that's talking about future impacts of other human activities that aren't attributable to the fork, Section 321 would preclude taking those future impacts into account in the Section 7 analysis, in our view. Because it says for purposes of the Section 7, water consumption is not a direct or indirect effect of the agency's actions will not be considered. The other point about this population is, you know, there is not like a discreet population of northern Mexican garter snakes that live and die in the lower Bapa Kamari territory. This is a place where they're, they intermittently exist as they're transiting, there are opportunistic foragers, they will go to different places. And given that context, where they are only intermittently existing in the area, this very small impact on the water is something that the agency concluded will not have impacts that jeopardize the species, but because they think the effect on this population itself will be minimal because the garter snakes can move to forage in other land, and they're not restricted to 600 feet. The very notion that there are garter snakes there assumes that they have migrated there from San Pedro River or from the Cienegas up, farther up river. So they are capable of migrating, they only go 600 feet when they're foraging that day for food, that was based on the size of critical habitat needed to be around the river. But in this context, the impact, because they can, both because there are a small number of them and because they can relocate to better foraging habitat, the agency concluded the impact on the garter snakes will be minimal. And then also this population is not critical to the survival and recovery of the species in any event. All right. Thank you, counsel. Thank you, Stuart Gillespie. The field problem in the accounting method does require a remand by this court. So the alleged water credit here for the preserved petrified forest property was the linchpin. That's what shifted the fort from a massive groundwater deficit to an immediate groundwater surplus the very next year. Without that, we have no evidence that the service would have reached a no jeopardy determination. Opposing counsel, my friend, both concedes that, but then he appears to argue that this might be a case of harmless error. I think it's crucial that the court reviews the appropriate standard here. So where there's a fundamental error in the reasoning, this court can only upheld the decision if it is certain that the agency would have reached the same conclusion, notwithstanding that error. That's the FERC case we cited in our case. It's also the 10th Circuit standard in the Zizium case at 958, F3D at 1014. The government doesn't even attempt to satisfy that standard, and nor could it, because it shows here in the biological opinion that it repeatedly relied on a groundwater surplus to offset those adverse impacts. And if it had faced a massive deficit, it likely would not have reached a no jeopardy determination, or at the very least, we don't know. Now, I do want to turn to the biological opinion on this issue regarding the water umbel, because it's important that the court rules on what the biological opinion itself states. And I would direct this court to 2ER201. And at the top of that page, the service specifically noted that there would be residual and temporary reductions in base flows. And then it said that those may occur before the onset of a positive Fort Huachuca groundwater budget balance in 2014 or 2015, wherein a surplus of conservation measure-driven water savings overtakes the water demands on base flows. It's very clear they're relying on that surplus. That surplus was generated by the water credit, and it simply did not exist. Without that, they wouldn't be able to reach that conclusion, and it would be flawed. And so this whole discussion about the groundwater model, it doesn't affect the result here, which requires remand to the agencies to address this flaw and clarify their analysis and get it right. And this has been years that we've been litigating at the Fort over its failure to comply with the Endangered Species Act. And yet, time and again, we hear the same arguments. Oh, these are just minor impacts to species. These are unparalleled species that depend on flows for their survival. But what would happen on a remand? Because it's 2023, and the time period estimated here wasn't it 2014 to 2024? And so is it just going to look for another year? Or is there now another one in process that's going to be taken over? Or does that stand? Your Honor, I don't know where the process is. I realize I'm short on time, but I do want to address this. And the fundamental concern here is that not only do they continue to rely on this biological opinion and continue to rely on this alleged water surplus, but they're defending it, and they're going to rely on it into perpetuity. They're going to continue to claim water credits for this easement when they don't exist. They haven't demonstrated they're reasonably certain to occur. They're going to do that into perpetuity in the next round and the round after that. And it's going to be the species that are going to suffer because they're not going to benefit from a mitigation measure that actually provides water credits to offset the Fort's ongoing persistent groundwater deficit. Thank you for your time. All right. Thank you very much, counsel. To both sides, matters submitted.
judges: NGUYEN, COLLINS, LEE